# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| **DANIEL FOX,** | |
|                 **Plaintiff,** | |
| **v.** | Case No. _____ |
| **BOARD OF POLICE COMMISSIONERS OF KANSAS CITY,** | |
|     Serve: Bishop Mark Tolbert | |
|            1125 Locust Street | |
|            Kansas City, Missouri 64106 | |
| **CAPTAIN JAMES GOTTSTEIN,** | |
|     Serve: Metro Patrol Division | |
|            7601 Prospect Avenue | |
|            Kansas City, Missouri 64132 | |
| **SERGEANT WILLIAMS MAJORS,** | |
|     Serve: Metro Patrol Division | |
|            7601 Prospect Avenue | |
|            Kansas City, Missouri 64132 | |
| **and** | |
| **OFFICER JOHN DOE,** | |
|                 **Defendants.** | |

## COMPLAINT

Plaintiff Daniel Fox, for his Complaint against Defendants the Board of Police Commissioners of Kansas City ("BOPC"), and Captain James Gottstein, Sergeant William Majors, and Officer John Doe (collectively, the "KCPD Officers"), states as follows:

## Summary of Action

1.      In December of 2019, police officer Eric DeValkenaere shot and killed an unarmed homeowner after entering the man's property with his gun drawn but without

a warrant, probable cause, or exigent circumstances to justify his actions. In November of 2020, a Judge found DeValkenaere guilty of involuntary manslaughter in the second degree and armed criminal action. In protest of DeValkenaere's conviction, the Kansas City, Missouri Police Department ("KCPD") and its officers have now adopted a policy and practice in which they refuse to investigate or take action in response to crimes on personal property even when exigent circumstances exist to justify immediate action without a warrant.

2.      In July of 2022, Plaintiff reported an active break-in of his neighbor's house. KCPD officers quickly arrived to find a door to the house kicked in and the intruder likely still inside. But the officers refused to take any action and soon left, telling Plaintiff their "hands were tied" to do anything further to stop the apparent burglary in progress. This was a real-life implementation of the protest policy adopted after the DeValkenaere conviction, which KCPD officers view as incorrect and hope to be reversed on appeal. This situation has likely played out hundreds of times since the policy change following the DeValkenaere conviction.

3.      After this experience left Plaintiff feeling unsafe and unprotected, he posted a video to his Twitter account criticizing the officers' approach and asking that the matter be elevated to the Mayor or KCPD officials. In direct response to his Twitter post, Plaintiff was soon harassed and intimidated into removing his critical Twitter post by three other KCPD officers—including a watch captain who left a threatening voicemail for Plaintiff and two armed officers who showed up at his home unannounced in a late-night show of force to "stop by and talk to" Plaintiff about the matter.

4.     The actions of these officers and the policies, and practices of the BOPC that facilitate these actions, violate Plaintiff's Constitutional right to engage in free speech on matters of public importance without retaliation. These Constitutional violations have caused Plaintiff injuries redressable under 42 U.S.C. § 1983, including loss of free speech and emotional distress. Plaintiff's action is filed to recover damages for those injuries and to procure injunctive relief to prevent future recurrence of these violations.

**Parties**

5.     Plaintiff Daniel Fox is a resident of City of Kansas City, Missouri, and during all times relevant to the causes of action pleaded here, he has lived within the City of Kansas City, Missouri.

6.     Defendant BOPC is a governmental body created pursuant to Mo. Rev. Stat. § 84.020 *et. seq.*, consisting of four appointed commissioners together with the Mayor of Kansas City.

7.     Defendant Captain James Gottstein is an individual who is a citizen of the state of Missouri. Defendant Gottstein works as a Watch Captain of the KCPD assigned to the Metro Patrol Division located at 7601 Prospect Kansas City Mo 64132. This action is filed against Defendant Gottstein in his individual and official capacity.

8.     Defendant Sergeant William Majors is an individual who is a citizen of the state of Missouri. Defendant Majors works as an officer of the KCPD assigned to the Metro Patrol Division located at 7601 Prospect Kansas City Mo 64132. This action is filed against Sergeant Majors in his individual and official capacity.

9.      Officer John Doe works as an officer of the KCPD assigned to the Metro Patrol Division located at 7601 Prospect Kansas City Mo 64132. This action is filed against Officer Doe in his individual and official capacity.

## Jurisdiction and Venue

10.      This Court has subject matter jurisdiction pursuant to 28 U.S. §1331 as this is a civil action arising under the Constitution of the United States.

11.      This Court has personal jurisdiction over all Defendants in this case because all parties are domiciled within the State of Missouri and all the events giving rise to the claims occurred in the State of Missouri.

12.      Venue is proper in this Court pursuant 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this judicial district and all events giving rise to the claim occurred in this judicial district.

## Background Facts Common to All Counts

13.      In the early morning hours of July 15, 2022, at approximately 1:18 AM, Plaintiff heard a loud noise coming from his neighbor's house located at 5347 Rockhill Road, Kansas City Missouri, 64110. Startled, Plaintiff looked outside to see what caused the loud noise. Upon seeing no movement, Plaintiff then went outside to investigate further. Once outside Plaintiff discovered the loud noise was a product of an unknown person who had kicked in the door of his neighbor's house.

14.      Fearing for the safety of himself, his wife, and his two small children, Plaintiff went back inside his home and hurriedly called KCPD at approximately 1:21 AM to

report the break-in. After making this call, Plaintiff looked back over to his neighbor's house and was shocked and scared when he saw an unidentified intruder inside.

15. Two officers wearing patrol blue uniforms ("Initial Responding Officers") arrived at Plaintiff's residence at approximately 1:33 AM. The Initial Responding Officers arrived with their patrol lights activated and exited their vehicle to causally walk around the neighbor's house.

16. After their brief walk, the Initial Responding Officers knocked on Plaintiff's door and asked Plaintiff what he knew about his neighbor's house or "who was on the premises." Plaintiff was relieved to see the officers and responded that he believed it was student housing owned by Rockhurst or UMKC and the students typically come and go with the semester. Plaintiff explained to the officers that although students come and go, it was not ordinary for someone to kick the door open in the middle of the night.

17. Without entering the neighbor's house, investigating the break in, or even knocking on the neighbor's door, the Initial Responding Officers left the area approximately ten minutes after their arrival.

18. Confused and alarmed that the Initial Responding Officers left the scene without resolving the situation, Plaintiff called the police department at 1:46 AM to ask why the neighbor's door was still open and why the officers did nothing about the intruder in the neighbor's house. Plaintiff received a call back at 1:50 AM from one of the Initial Responding Officers, who informed Plaintiff that they could not do anything more because "their hands were tied."

19.     Believing the intruder was still inside the neighbor's house, Plaintiff asked the officer if he was expected to sit in his house with a gun all night to protect his family in case the intruder came for him, his wife, and his two small children. Again, the Initial Responding Officer replied that her "hands were tied."

20.     Because the Initial Responding Officers failed to take any further action, Plaintiff stayed awake all night standing guard in his home to protect his family. This experience left Plaintiff upset, fearful and concerned about how KCPD and its officers had handled the incident.

21.     At approximately 8:30 AM that same morning, Plaintiff posted a video to his Twitter account detailing the previous night and expressing that he was scared for his family's safety because officers refused to take the appropriate action when an intruder was actively breaking into his neighbor's house. Plaintiff questioned the apparent KCPD policy of inaction in these situations. Plaintiff noted that the intruder still appeared to be in the neighbor's house when officers arrived and when they left, yet the officers made no effort whatsoever to meaningfully address the situation or resolve the threat.

22.     At the end of Plaintiff's video, he expressed frustration and asked that the matter be brought to the attention of the right person of the Mayor's office or the KCPD to help him understand the inaction.

23.     At approximately 8:30 PM that same evening, Plaintiff received a call from an unknown number and did not answer the phone. Plaintiff later learned the call was from a KCPD officer claiming to be the Captain at Metro Patrol, who left the following message:

"Hi Mr. Fox, if this is your number, my name is James [unintelligible], I'm the watchman captain at Metro Patrol. You posted something on Twitter begging for attention, so I was calling you back to try to explain to you our procedures our limitations that have been placed upon us since the 4th amendment ruling concerning Eric DeValkenaere that was passed down like last year that strictly limited out ability to go on private property without owner consent or without vast vast knowledge on something happening like someone screaming for help inside. We no longer search abandoned houses without a warrant from a judge to go in, it strictly limited our ability to provide the public with safety and that's something you citizens need to know. That ruling had a direct impact on what we can do. Which is affecting you and I don't agree with it, we should be able to meet your need We should be able to go into a house that's next to you to keep you safe but we no longer do that because if we go in there and somebody be in there that belongs in there for some reason ya know maybe one of the college students is back and he aims a gun and we shoot at him then we are gunna be brought up on charges so we have to be very careful on how we proceed on those things.

But if you want to call me back this is my work number. I'm also going to have a sergeant contact you tonight who is a supervisor of those officers I believe. To talk to you also. umm

I'm sorry you had that experience, but many citizens are going to have that same experience but it's kind of out of the police's hands until that judgment is overturned on appeal so that we can go back to our business to keep citizens safe, you take care buh-bye."

24. The officer who left the voicemail on Plaintiff's phone is believed to be Defendant Captain James Gottstein.

25. Captain Gottstein never directly spoke to Plaintiff to address his concerns, never informed Plaintiff that additional officers were coming to his home (as opposed to calling him or contacting him by email), and never confirmed with Plaintiff that he would be comfortable with additional officers coming to his home (particularly late at night and in the circumstances described below).

26. At 9:52 PM the same evening, two KCPD officers arrived at Plaintiff's home. These officers are believed to be Sergeant Majors and Officer Doe. The officers arrived in the same vehicle together and parked in front of Plaintiff's home with the lights on their patrol vehicle activated. Their lights remained activated for the entire duration of the visit to Plaintiff's home. There was no need in this situation for the lights to remain activated, however, because this was a non-emergency visit and the patrol vehicle was parked in a parking zone with no need to warn other vehicles on the road of its presence.

27. Sergeant Majors wore a tactical chest vest adorned with weapons giving the impression a show of force was necessary during this encounter.

28. Plaintiff, his wife, and his two young children were already in bed when Sergeant Majors and Officer Doe arrived at his home late in the evening. Despite the late hour and without confirming the visit beforehand, the officers rang the doorbell of Plaintiff's home. Tired and confused as to why the officers were at her home, Plaintiff's wife answered the door and asked the officers what they needed. The officers responded that they wanted to "stop by and talk to" Plaintiff's husband.

29.     During this conversation, Plaintiff's wife noticed that Sergeant Majors had placed his right hand close to the gun on his right hip, leaving her nervous and questioning his intent. Plaintiff's wife told the officers that Plaintiff was in bed and would not be coming to the door.

30.     Sergeant Majors left a business card with Plaintiff's wife and asked that Plaintiff contact him. Plaintiff's wife then woke up Plaintiff and informed him she was very upset and scared about the interaction she just had with the officers.

31.     After being awoken, Plaintiff remembered he had a call from an unknown number and listened to the voicemail transcribed above from Captain Gottstein. Plaintiff was shocked at the tone of the voicemail that was aggressive, contentious, and threatening. Plaintiff was especially confused why Captain Gottstein would describe asking for help as "begging for attention."

32.     Given the intimidating late-night actions of Sergeant Majors and Officer Doe, coupled with the aggressive and dismissive message from Captain Gottstein, Plaintiff felt afraid and believed the true intentions of KCPD and its officers were not to help him, but to intimidate and retaliate against him for his critical Twitter post. When Plaintiff finished listening to the voicemail from Captain Gottstein, he was certain KCPD officers would not protect him because Captain Gottstein had specifically said in a veiled threat that the department would not be able to keep him safe.

33.     KCPD has a written policy for responding to community complaints, Policy No. 18-02. That policy instructs citizens to make formal complaints in person at their

nearest police station. Complaints will not be accepted over the telephone but, if a citizen calls on the phone, they will be advised on how to file a formal complaint.

34. Plaintiff's criticism via Twitter of KCPD practices was an informal complaint analogous to a phone call. Plaintiff asked that his complaint reach the right person at KCPD. Instead of directing Plaintiff to make a formal written complaint or forwarding Plaintiff's informal complaint to the Office of Community Complaints as instructed in the General Guidelines of Policy No. 18-02, the KCPD Officers took it upon themselves to respond directly to Plaintiff's critical Twitter post with intimidating conduct in violation of the stated policy. The KCPD Officers intentionally chose not to follow the KCPD policy on informal complaints because doing so would have cost them the opportunity to intimidate Plaintiff into deleting his critical Twitter post.

35. In the totality of circumstances, the KCPD Officers' actions caused Plaintiff to feel threatened, unsafe, and intimidated. Those actions include:

a. The Initial Responding Officers refusing to act.

b. Captain Gottstein's aggressive voicemail:

   i. Threatening Plaintiff that he was "begging for attention";

   ii. Threatening Plaintiff that the police are unable to keep him safe;

   iii. Threatening Plaintiff that other citizens will not be kept safe;

   iv. Threatening Plaintiff that he will only be safe if a judicial ruling is overturned; and

   v. Declining to follow KCPD policy for responding to citizen complaints.

10

c. The later responding officers, Sergeant Majors and Officer Doe:

    i. Visiting at a late hour with no confirmation they were welcome;

    ii. Visiting with their patrol vehicle lights activated for no legitimate reason throughout the entirety of their non-emergency visit;

    iii. One officer adorning himself in tactical gear with more weapons than the Initial Responding Officers; and

    iv. The same officer keeping his right hand close to the gun on his right hip, while speaking to the Plaintiff's wife about wanting to "stop by and talk" to Plaintiff.

36. Plaintiff reasonably believed that this pattern of intimidating and retaliatory conduct by the KCPD Officers was designed to pressure him into deleting his Twitter post critical of the KCPD actions.

37. For fear of further retaliation from the KCPD, Plaintiff immediately deleted his Twitter post after being told of his wife's upsetting visit with Sergeant Majors and Officer Doe and listening to the threatening voicemail from Captain Gottstein.

38. Plaintiff was so intimidated that he went further to search his entire Twitter history and delete every post he could find containing the word "police." This was done to avoid additional retaliation from KCPD and its officers, who obviously were monitoring his Twitter account. Plaintiff deleted at least four posts from his Twitter account that referenced police.

39. The BOPC plays an integral part in creating and implementing formal and informal police policies and procedures.

40. The BOPC developed, implemented, and carried out official policies, practices, or procedures which permitted, encouraged and condoned the use of the alleged retaliatory conduct of the KCPD Officers that resulted in the chilling of Plaintiff's First Amendment right to free speech.

41. In the alternative, Defendant BOPC created an unofficial custom which permitted, encouraged and condoned the use of intimidation tactics in response to criticism of KCPD practices. This unofficial custom facilitated the specific conduct of the KCPD Officers in this case by giving them unfettered power to unilaterally respond to Twitter criticism through the alleged retaliatory conduct that resulted in the chilling of Plaintiff's First Amendment right to free speech.

42. In the alternative, Defendant BOPC committed a deliberately indifferent failure to train or supervise the KCPD Officers to prevent the alleged retaliatory conduct of those officers that resulted in the chilling of Plaintiff's First Amendment right to free speech. In particular:

    a. Defendant BOPC has a policy regarding First Amendment protections in some circumstances, including Policy No. 21-04 related to the protection of the right the assembly in the event of public protest.

    b. This policy acknowledges that protecting the First Amendment rights of citizens is crucial to abiding by the United States Constitution.

    c. Despite that acknowledgment, the BOPC declined to create a *written* policy outlining First Amendment protections for speech on internet platforms, including critical speech likely to raise the ire of officers who might disagree

with or take offense to the criticism. The BOPC has completely and utterly failed to train and supervise KCPD officers in appropriately responding to these situations and interacting with citizens who have exercised their First Amendment right to speech via the internet. Contrasted with other written policies, the lack of a written policy on this significant issue likely to arise on a regular basis demonstrates the BOPC's deliberate indifference to the protection of the right to free speech in this instance.

d. The BOPC's deliberate indifference to Plaintiff's First Amendment right to free speech in this circumstance created the opportunity for the retaliatory actions of the KCPD Officers, who now hold unfettered power in an uncontrolled environment to harass and intimidate citizens into silences on matters of public importance.

## Clearly Established Constitutional Rights

43. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, ... and to petition the Government for a redress of grievances." U.S. Const. Amend. I.

44. The BOPC and all police officers—including the KCPD Officers—know that all citizens have a constitutional right to free speech.

45. Defendants, as alleged herein, individually and collectively violated clearly established constitutional and/or statutory rights of which a reasonable person would have known.

## Count I
## Violation of the First Amendment Under 42 U.S.C. § 1983

46.     Plaintiff incorporates paragraphs 1-45 as if fully set forth herein.

47.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

48.     Defendants' decision to threaten and intimidate Plaintiff into deleting his Twitter posts had the effect of chilling his speech and violated the First Amendment in at least three ways: (i) as an unconstitutional restriction to a public forum; (ii) as unconstitutional content- and viewpoint-based discrimination; and (iii) as a violation of Plaintiff's right to speak to matters of public interest.

49.     Defendants have adopted municipal policies, practices, and customs that have caused the violations complained of herein; and, in the alternative, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

50.     Defendants acted under color of state law when they deprived Plaintiff of his right to free speech critical of the government and when they committed the alleged intimidating actions that caused Plaintiff to delete his Twitter posts.

51.     Defendants' actions against Plaintiff were substantially motivated by Plaintiff's engagement in First Amendment protected activity. The KCPD Officers engaged in a deliberate effort to deter future similar activity, which demonstrates a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

52.     The above-described conduct was, and continues to be, a proximate cause of Plaintiff's enduring pain and suffering and has chilled his desire to participate in future speech in a public forum regarding matters of police conduct. These violations of the First Amendment are also continuing and causing irreparable harm.

53.     The KCPD Officers engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and are therefore liable to Plaintiff for punitive damages.

## Count II
## First Amendment Retaliation Under 42 U.S.C. § 1983

54.     Plaintiff incorporates paragraphs 1-53 as if fully set forth herein.

55.     Plaintiff engaged in speech protected under the First Amendment by posting his criticism of KCPD policies and practices on Twitter on July 15, 2022.

56.     Defendants responded to Plaintiff's constitutionally protected activity by retaliating against him, including committing the alleged actions to single him out for his exercise of free speech and to threaten and intimidate him into deleting his criticism of KCPD practices on a matter of public importance.

57.     By engaging in the alleged conduct Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and deter him from posting criticisms of the KCPD in the future.

58.     Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights and the content and viewpoint expressed in his speech.

59. The chronology of the events demonstrates a causal connection between Plaintiff's protected speech and the Defendants' actions to chill that particular speech and other similar speech. But for Plaintiff's Twitter post, Captain Gottstein, Sergeant Majors, and Officer Doe would never have engaged in the alleged intimidating acts designed to strong-arm Plaintiff into deleting his Twitter post.

60. Plaintiff has a clearly established right under the First Amendment not to suffer retaliation for engaging in protected free speech. Any reasonable law enforcement officer and law enforcement institution knows of this clearly established right.

61. Defendant BOPC failed to properly train and supervise officers with respect to the First Amendment, the rights of persons like Plaintiff to exercise free speech under the First Amendment, and the appropriate means of responding without retaliation to messages critical of law enforcement.

62. Defendants' intentional actions as described herein deliberately deprived Plaintiff of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

63. Defendants' custom, policy and practice of permitting officers to retaliate against citizens who exercise their First Amendment right to criticize law enforcement is not a reasonable regulation of constitutionally protected activities.

64. Defendants acted under color of state law when they deprived Plaintiff of his right to free speech critical of the government and when they committed the alleged intimidating actions that caused Plaintiff to delete his Twitter posts.

65. The above-described conduct was, and continues to be, a proximate cause of Plaintiff's enduring pain and suffering and has chilled his desire to participate in future speech in a public forum. These violations of the First Amendment are also continuing and causing irreparable harm.

66. The KCPD Officers engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and are therefore liable to Plaintiff for punitive damages.

<u>**Count III**</u>
**Conspiracy to Violate Constitutional Rights Under 42 U.S.C. §§ 1983 and 1985**

67. Plaintiff incorporates paragraphs 1-66 as if fully set forth herein.

68. With a meeting of the minds for an unlawful objective, the KCPD Officers conspired and acted in concert to deny Plaintiff his constitutional rights via coordinated acts of intimidation designed to force Plaintiff to delete his Twitter post critical of KCPD practices.

69. Plaintiff was thereby injured and deprived of the ability to exercise his Constitutional right to free speech on important public issues.

70. The above-described conduct was, and continues to be, a proximate cause of Plaintiff's enduring pain and suffering and has chilled his desire to participate in future speech in a public forum. These violations of the First Amendment are also continuing and causing irreparable harm.

71. The KCPD Officers engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and are therefore liable to Plaintiff for punitive damages.

## Count IV
## Grounds for Injunctive Relief

72.     Plaintiff Incorporates paragraphs 1-71 as if fully set forth herein.

73.     The Plaintiff is a citizen of Kansas City, Missouri under the patrolling juris-dictions of the KCPD controlled by the BOPC.

74.     As alleged above, Plaintiff has been injured by the acts of the BOPC and the KCPD Officers. This conduct is likely to continue and threatens future harm to Plaintiff and other member of the community.

75.     One set of likely recurring constitutional violations involves intimidating and retaliatory responses of KCPD officers to public criticism of law enforcement made through social media channels like Twitter, which will continue to occur because of the lack of a formal written policy by the BOPC controlling such conduct.

76.     These violations will cause irreparable harm to citizens whose rights of free speech are chilled by retaliatory conduct. The balance of harms and public interest favor enactment of a policy to expressly prohibit such retaliatory conduct.

77.     Another form of likely recurring harmful conduct involves the KCPD's new practice adopted since the DeValkenaere conviction in which KCPD officers refuse to in-vestigate or take appropriate action in response to apparent crimes on personal property even when exigent circumstances exist to justify immediate action without a warrant. As confirmed by Captain Gottstein, the KCPD's standard policy and practice is that officers will not enter into a personal residence to stop a crime in progress without a warrant, an invitation from the owner, or indications far exceeding the normal standard of exigent circumstances.

78.	This new policy and practice stems from a gross misinterpretation of the facts and ruling in the case of *State of Missouri v. Eric J DeValkenaere*, case no. 2016-CR02823 (2021). In that case an officer was convicted of involuntary manslaughter in the second degree and armed criminal action for shooting an unarmed citizen in his home. In a bench trial, the court explained its finding of conviction as follows:

> [D]efendant . . . had no probable cause to believe that a crime had been committed by Cameron Lamb; . . . no exigent circumstances as that phrase has been defined by the law justified their presence on the property at 4154 College that day. . . . [Defendant] had only reasonable suspicion that criminal activity was afoot. *Transcript of State of Missouri v. Eric J DeValkenaere*, case no. 2016-CR02823 (2021): Pg. 698, Ln 16-25.

> Sgt. Schwalm and defendant were the initial aggressors in the encounter with Cameron Lamb on December 3rd, 2019, and had a duty to retreat from the encounter under the circumstances. *Transcript of State of Missouri v. Eric J DeValkenaere*, case no. 2016-CR02823 (2021): Pg. 702, Ln. 20-23.

> Sgt. Schwalm and [defendant] were unlawfully on the property, that they were both escalating a situation that previously had deescalated, and that their actions created or exacerbated the risk that what ultimately occurred would. *Transcript of State of Missouri v. Eric J DeValkenaere*, case no. 2016-CR02823 (2021): Pg. 70, Ln. 18-22.

> The Court concludes that this conduct was a gross deviation from the standard of care that a reasonable person would exercise in the situation and constituted criminal negligence as that phrase is defined under Missouri law. were unlawfully on the property, that they were both escalating a situation that previously had deescalated, and that their actions created. *Transcript of State of Missouri v. Eric J DeValkenaere*, case no. 2016-CR02823 (2021): Pg. 703:704, Ln. 23-2.

79.	In other words, DeValkenaere was convicted because he shot a man in his own home when he did not have probable cause a crime was being committed and was

the initial aggressor with a duty to retreat. His conduct in the situation deviated markedly from the standard of care that a reasonable person would exercise.

80. The BOPC and Captain Gottstein grossly misinterpret the Court's decision in *DeValkenaere* because nothing in this case precludes an officer from entering a house to stop a crime in progress when exigent circumstances exist.

81. In the case of Plaintiff's neighbor's house, there was an obvious break-in with an unknown assailant who appeared to still be in the house. On those facts, officers had probable cause the believe a crime was being committed and there were exigent circumstances to protect the lives and property of the people possibly inside the dwelling or owners of the dwelling from an active break in. Probable cause included: (1) a witness, Plaintiff, to an unknown intruder in the dwelling; (2) Plaintiff describing the loud noise, the open door, and the unknown intruder turning on lights; and (3) officers seeing a door open to the dwelling at approximately 1:30 AM in the morning, an unusual time to have a door to your home wide open. Exigent circumstances included: (1) probable cause of a residential burglary in progress; and (2) probable cause of the need to prevent the criminal suspect's escape.

82. Even without an exigent circumstance, officers had probable cause a crime was being committed and an option to obtain a warrant for entry on the premises.

83. The responding officers chose to do none of these things. Instead, they left the property without taking any action against a potentially violent crime in progress that posed an ongoing threat because they claim their "hands were tied" by a faulty and disingenuous interpretation of the *DeValkenaere* ruling.

84.     The BOPC, KCPD, and its officers have essentially said that they will not respond to crimes in progress inside a residential property unless they have consent of the owner to enter the property or absolute immunity from liability for their subsequent actions. This policy and practice leaves citizens without proper police response to ensure their safety in circumstances like those encountered by Plaintiff.

85.     The possibility of irreparable harm to the Plaintiff and community is clear and present if this practice continues. It is quite literally a matter of life or death in some cases, and in all cases it is a matter of general public safety and peace of mind in appropriate police response to situations of dangerous criminal activity.

86.     The new KCPD policy and practice of hands-off policing adopted since the *DeValkenaere* ruling is contrary to the public interest. The balance of harms weighs heavily in favor of returning to the policy and practice of responding to reported crimes in place before the *DeValkenaere* ruling, where officers were not indiscriminately prohibited from entering personal residences with probable cause or in exigent circumstances.

### **Relief Requested**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law or equity, including but not limited to the following:

1.      Recovery of damages, including economic losses on all claims as allowed by law; compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined

at trial; punitive damages on all claims allowed by law and in an amount to be determined at trial; attorneys' fees and the costs associated with this action, on all claims allowed by law under §1983; and pre-and post-judgment interest at the lawful rate.

2.  Injunctive relief, including:

    a.  Mandated adoption of a formal written policy by the BOPC that will instruct KCPD officers on the appropriate response to social media criticism and specifically restrict them from engaging in any retaliatory conduct against such criticism; and

    b.  Return to the pre-*DeValkenaere* policy and practice of entering personal residences or property without a warrant when justified by probable cause or exigent circumstances.

3.  All other appropriate relief in law or equity as the Court may deem just and proper in the circumstances.

### Demand for a Jury Trial

Plaintiff hereby demands a trial by jury on all claims and issues so triable.


Respectfully submitted,

**KRIGEL & KRIGEL, P.C.**

By: */s/ Sarah J. Duggan*
     Stephen J. Moore    Mo. Bar #59080
     Sarah J. Duggan    Mo. Bar #73687
     4520 Main Street, Suite 700
     Kansas City, Missouri 64111
     Telephone: 816-756-5800
     Facsimile:  816-756-1999
     sjmoore@krigelandkrigel.com
     sduggan@krigelandkrigel.com

*Attorneys for Plaintiff Daniel Fox*